UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

THERESA KENNEDY,

Plaintiff,

v.

Civil Action No.: 14-11248
Honorable Stephen J. Murphy, III
Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

Defendant.
_________________________________/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 16]**

Plaintiff Theresa Kennedy appeals a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which were referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, the Court finds that the ALJ did not err in developing her RFC based in part on the medical opinion of the state agency consulting psychologist, or in giving more weight to his opinion than to the examining consultants.

Therefore, the Court **RECOMMENDS** that:

- the Commissioner's motion **[16]** be **GRANTED**;
- Kennedy's motion **[13]** be **DENIED**; and,
- the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

## I. BACKGROUND

At the time of the administrative hearing, Kennedy was a 49-year-old high school graduate with one year of college. She had previously been employed as a dental assistant from 1993 until March 2008, when she stopped working to move to Asia with her husband. [R. 10-6, Tr. 261-63, 275-76]. Shortly before the move, her husband sought a divorce and Kennedy did not ultimately move. [R. 10-8, Tr. 645]. She claims disability as of March 30, 2008, as a result of both physical and mental impairments. Her date last insured for benefits was March 31, 2012.

### A. Procedural History

On April 15, 2010, Kennedy filed an application for DIB, alleging disability as of March 30, 2008. [R. 10-5, Tr. 242-45]. The claim was denied initially on September 20, 2010, and Kennedy filed a timely request for an administrative hearing. [R. 10-4, Tr. 114-118; 120-21]. Kennedy and a vocational expert ("VE") testified at the March 20, 2012, hearing before

an administrative law judge ("ALJ"). [R. 10-2, Tr. 41-91]. The ALJ found Kennedy not disabled in a September 7, 2012, written decision. [*Id.*, Tr. 24-40]. On January 29, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of this review. [*Id.*, Tr. 1-6]. Kennedy filed for judicial review of the final decision on March 26, 2014. [1].

**B. Evidence in the Record**

*1. Plaintiff's Testimony and Subjective Reports*

Kennedy claimed disability from a history of brain aneurysms, arthritis, right hip dislocation, central thrombothycenia, restless leg syndrome, bowel problems, degenerative disc disease, depression and anxiety. [R. 10-6, Tr. 274]. She initially alleged that she stopped working due to her conditions, but testified that she stopped working due to an impending move to Asia. [*Id.*, Tr. 275; R. 10-2, Tr. 65].

According to Kennedy, her conditions interfered with her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands and get along with others. [R. 10-6, Tr. 304]. She claimed that she was able to pay attention for 30 minutes at a time, sometimes had difficulty interacting with authority figures, and did not handle stress well. [*Id.*, Tr.

304-05]. She reported that she did not sleep more than two hours in a stretch. [R. 10-6, Tr. 300].

Kennedy described herself as forgetful, and too tired and in too much pain to work. [*Id.*, Tr. 299; R. 10-2, Tr. 53]. She testified that balance issues caused her to fall and sustain concussions the previous autumn, [R. 10-2, Tr. 59], but the record contains no corroborating medical evidence. Kennedy received inpatient mental health treatment for two days in 2010, and outpatient therapy thereafter. [*Id.*, Tr. 62, 64]. She said that she often put off treatment due to lack of health insurance, but had not sought affordable mental health treatment from a county health department. [*Id.*, Tr. 54, 64].

Kennedy testified that she lived alone in a house and was capable of caring for her daily needs, including self-care, cooking, keeping an impeccably clean house, caring for pets, shopping, and yard work. [*Id.*, Tr. 69, 73-77; R. 10-6, Tr. 300-302]. Her reports regarding the length of her daily activities differed. She testified that did "small amounts" of house work daily, but also that she did two to four hours of house work each day and sometimes followed up with a walk outside. [R. 10-2, Tr. 69, 74]. In a report, she alleged that she could only complete one to two hours of activity a day before needing to take pain medication and rest. [R. 10-6, Tr. 310].

Yet, Kennedy said that she wore a pain patch for a pinched nerve in her shoulder, and took no other pain medication. [R. 10-2, Tr. 61, 68].

In her spare time, Kennedy watched television, played on the computer, enjoyed decorating her apartment and had recently spray-painted a couple of tables for a friend. [R. 10-2, Tr. 77; R. 10-6, Tr. 303]. Kennedy claimed that she did not socialize anymore, but also that she went to mass every Wednesday and sometimes visited a friend. [R. 10-2, Tr. 72, 76; R. 10-6, Tr. 303]. She loved swimming and had not done so recently only because of the inclement weather. [R. 10-2, Tr. 77].

Kennedy's friend filed a third-party function report that materially differed from Kennedy's self-reports. Specifically, the friend said that Kennedy did very little house work and could no longer keep her house spotless, that she rarely shopped, that she could no long do any arts and crafts, and that she had compromised self-care capabilities. [*Id.*, Tr. 283-94].

*2. Medical Evidence*

Although Kennedy alleged disability based on both physical and mental impairments, her appeal mainly challenges the ALJ's assessment of her mental condition. Therefore, only records relevant to Kennedy's mental condition will be summarized below.

*a. Treating Sources*

In 2007, Kennedy underwent surgery to clip a brain aneurysm. [R. 10-7, Tr. 394-97]. Subsequently, although she reported headaches and episodic extremity weakness, her follow-up tests were largely unremarkable. [*Id.*, Tr. 343, 385, 389-90, 422-24, 626]. Kennedy associated her bad headaches, anxiety and stress to her bad divorce at an appointment with her primary care physician Dr. Stephen Bachmeyer in 2009. [*Id.*, Tr. 340-41; 343; 443]. He prescribed Cymbalta, Xanax and other medications. [*Id.*].

In November 2009, Kennedy's son called Dr. Bachmeyer out of concern that his mother's drinking of alcohol was possibly interacting with her medications, which resulted in her being transported by EMS to the emergency room. [*Id.*, Tr. 404-405]. Kennedy was combative, but disclosed that she drank to relieve stress caused by her husband leaving her, her job and her finances. [*Id.*, Tr. 404]. Diagnosed with acute alcohol intoxication, Kennedy refused to allow the completion of an evaluation or treatment, and left the emergency room against medical advice in stable condition. [*Id.* Tr. at 405].

In May 2010, Kennedy told Dr. Bachmeyer that she was willing to be admitted for inpatient treatment after complaining of increased stress and

depression. [*Id.*, Tr. 340]. However, after one day of inpatient treatment, she claimed that her admission was due to a "misunderstanding" and was discharged in stable condition. [*Id.*, Tr. 351-52; 530-32]. At discharge, her diagnosis was major depressive disorder and her Global Assessment of Functioning ("GAF") score was 55.[1] [*Id.*, Tr. 530-32].

Kennedy was seen on an outpatient basis five times over the next five months. [*Id.*, Tr. 574-81; 608]. By fall 2010, she reported that her medications were finally working and that she had "minimal" improvement in her depression symptoms. [*Id.*, Tr. 574-75; 580-81]. Kennedy was found to have an intact memory, good insight and good judgment, and her GAF score had increased to 55-60. [*Id.*, Tr. 581].

Dr. Kashif Khan conducted a psychiatric evaluation of Kennedy March 2011. [*Id.*, Tr. 601-602]. His examination revealed her to have a depressed mood, an affect that was broad and reactive, thought processes that were linear and goal-directed, no delusions, good spelling and recall,

---

[1] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted). Scores in the range of 61-70 indicate some mild symptoms. *Karger v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 739, 745 (6th Cir. 2011).

adequate fund of knowledge, fair insight and intact judgment. [*Id.*, Tr. 602]. Dr. Khan issued Kennedy a GAF score of 50-55 and diagnosed her with depressive disorder. [*Id*.]. For treatment, he continued her Xanax, and added Prozac and Trazadone (the latter for sleep). [*Id.*].[2]

*b. Consultative and Non-Examining Sources*

James Steyaert, Ph.D. performed a consultative psychological examination of Kennedy for the State of Michigan in October 2009. [R. 10-7, Tr. 333-36]. Dr. Steyaert noted that, during the mental status examination, Kennedy exhibited good eye contact and was cooperative, and there was no evidence of malingering. [*Id.*, Tr. 335]. She was able to remember six digits forward and five backward, recall three of three objects three minutes later, and had no problem with serial counting forward or backwards, but her subtraction and multiplication were slightly off. [*Id*., 335-36]. Kennedy's answers during the abstract thinking, similarities and

[2] There are additional treatment notes from therapy that Kennedy underwent in late 2012, after the ALJ's decision. [R. 10-8, Tr. 656-63]. Those new records were submitted to the Appeals Council ("AC"), but the AC denied review. [R. 10-2, Tr. 1-4]. Under these circumstances, the new evidence cannot be considered here, but the Court could remand with an instruction that the ALJ consider it upon a showing that the new evidence is material and good cause exists for the failure to offer it in the prior proceeding. 42 U.S.C. § 405(g); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. Ky. 1993); *Elliott v. Apfel*, 28 Fed.Appx. 420, 423-24 (6th Cir. 2002); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002). Kennedy makes no argument for such a remand and does not rely upon the new evidence in her motion.

differences and judgment portions of the mental capacities examination were all normal. [*Id*., Tr. 336].

Dr. Steyaert diagnosed Kennedy with depressive disorder and panic disorder, and concluded that "she has the capacity to understand, carry out simply instructions but her ability to recall instructions is questionable." [*Id.* at 336]. He issued her a GAF score of 45 with a guarded prognosis, but the psychologist based his opinion in part on Kennedy physical ailments. "Due to the intensity and severity of the claimant's medical and psychiatric difficulties she most probably would have difficulty with participation in a variety of work activities. The claimant indicates that she does have lifting restrictions . . . ." [*Id.*].

In September 2010, psychologist George Starrett, Ed.D, reviewed Kennedy's records. [R. 10-3, Tr. 105-06]. He assessed her with an affective disorder that created mild limitations in activities of daily living, mild limitations in social functioning and moderate difficulty in maintaining concentration, persistence and pace. [*Id.,* Tr. 106]. Dr. Starrett opined that Kennedy was able to "understand, carry out, and remember simple instructions; make simple work-related judgments and decisions, respond appropriately to supervision, coworkers and work situations, and deal with changes in a routine work setting." [*Id.*].

Nic Branscomb, D.O., conducted a consultative physical examination of Kennedy in May 2012, and reported that her brain aneurysm had caused her difficulty with daily living and moderate difficulty with memorization and remembering. [R. 10-7, Tr. 635-39]. The following month, Dr. Branscomb completed a medical source statement related to Kennedy's mental condition, opining that she had mild difficulty in remembering simple instructions, although no difficulty in carrying them out; moderate difficulty in making judgments or simple or complex work-place decision; marked difficulty in understanding, remembering and carrying out complex instructions; and, no difficulty with interacting with others. [*Id.*, Tr. 640-41]. Dr. Branscomb wrote that he did not witness these limitations, but that they reflected Kennedy's complaints. [*Id.*, Tr. 640].

Elizabeth Bishop, Ph.D., conducted a second consultative psychological exam of Kennedy in May 2012, during which Kennedy reported dementia since her aneurysm, depression, anxiety and panic attacks. [R. 10-8, Tr. 644-46; 648]. The exam revealed Kennedy to have good hygiene, clear, logical and spontaneous speech, and fair eye contact, and her mental capacity testing was consistent with that conducted by Dr. Steyaert . [*Id.*, Tr. 646; 649-50].

Dr. Bishop administered the Weschler Adult Intelligence Scale test,

which revealed Kennedy to have a full scale IQ of 80, "placing her in the borderline range of general intellectual functioning." [*Id.,* Tr. 645-47]. However, Dr. Bishop noted that Kennedy had difficulty using her hands due to arthritis, which may have lowered her processing speed index. [*Id.*, Tr. 646-47]. Based on her examination of Kennedy, on Kennedy's subjective reports, and on an apparent misunderstanding that Kennedy "has not worked since prior to her surgery," Dr. Bishop diagnosed her with dementia secondary to a brain aneurysm, panic disorder with agoraphobia, major depressive disorder and borderline intellectual functioning. [*Id.*, Tr. 647]. She issued Kennedy a GAF score of 55 and opined that "[g]iven her dementia, cognitive limitations, depression, panic attacks, and multiple medical problems, it is highly unlikely that [Kennedy] can maintain consistent employment." [*Id.*, Tr. 651].

Dr. Bishop also completed a medical source statement, finding that Kennedy had moderate limitations in all areas related to understanding, remembering and carrying out instructions, as well as in making judgments and decisions in the workplace. [*Id.*, Tr. 652]. She found that Kennedy had mild limitations in social functioning except that she had moderate difficulties in responding appropriately to workplace changes. [*Id.*, Tr. 653].

**C. The ALJ's Application of the Disability Framework**

DIB is available for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps. First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4).[3] Second, if the claimant has not had a severe impairment or a combination of such impairments[4] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual

---

[3] Sections 1520(a)(4) and 920(a)(4), which pertain to DIB and SSI respectively, list the same five-step analysis.

[4] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 1520(c); 920(c).

functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following the five-step sequential analysis, the ALJ determined that Kennedy was not disabled. At step one, she found that Kennedy had not engaged in substantial gainful activity since her alleged onset date. [R. 10-2, Tr. 29]. At step two, she determined that Kennedy suffered from a number of severe impairments, including insomnia, a brain aneurysm, and "mental health impairments." [*Id.*].

At step three, the ALJ compared Kennedy's impairments to the relevant listings and determined that none of her impairments met or medically equaled a listed impairment. [*Id.*, Tr. 30-31]. With respect to her mental impairments, the ALJ found that Kennedy did not meet a listing because she had no more than mild limitations in activities of daily living, moderate limitations in social functioning and moderate limitations in maintaining concentration, persistence and pace, with no episodes of

decompensation of extended duration. [*Id.*].

Next, the ALJ assessed Kennedy's residual functional capacity, finding her capable of a limited range of light work. [*Id.*, Tr. 32]. Specific to her mental impairments, the ALJ determined that the work should involve "simple, routine, repetitive tasks, [be] low stress, defined as no production paced work, [with] occasional use of judgment and occasional changes to the work setting; and no more than occasional superficial interaction with coworkers, supervisors and the public." [*Id.*]. In making this determination, the ALJ gave the most weight to the reviewing consulting psychologist, and "less" or "little" weight to the opinions of examining consultants Drs. Steyaert, Branscomb and Bishop, finding that their opinions were outside of their medical expertise, based mainly on subjective reports, and/or inconsistent with their own examination findings. [*Id.*, Tr. 35].

At step four, the ALJ determined that, based on the foregoing RFC, Kennedy would be unable to return to her past relevant work as a dental assistant. [*Id.*, Tr. 36]. However, the ALJ concluded at step five, with the assistance of VE testimony, that there were a significant number of jobs in the national economy that a hypothetical claimant who matched Kennedy's profile could still perform, and thus she was not disabled under the Act. [*Id.*]. Specifically, the VE testified that such a hypothetical claimant could

still perform the jobs of mail clerk (119,960 jobs in the national economy), office helper (85,620 jobs), or bench assembler (394,270 jobs). [*Id.*, Tr. 37].

## II. STANDARD OF REVIEW

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec*., 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards. "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Gentry*, 741 F.3d at 723. *See also Rogers*, 486 F.3d at 249. In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

With these standards in mind, this Court finds that the ALJ's determination that Kennedy is not disabled is legally sound and supported by substantial evidence.

## III. ANALYSIS

### A. ALJ's Reliance on "Single Decision Maker"

Kennedy argues that the ALJ erroneously relied on the opinion of a non-physician "single decision-maker" in formulating her physical RFC. The single decision-maker model allows a state agency employee who is not a medical professional to render an initial decision without documenting medical opinions. *Malcolm v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 U.S. Dist. LEXIS 39115, *10-11, 2015 WL 1439711, *5 (E.D. Mich. Mar. 27,

2015) (*quoting White v. Comm'r of Soc. Sec.*, No. 12-cv-12833, 2013 U.S. Dist. LEXIS 114584, 2013 WL 4414727, at *8 (E.D. Mich. Aug. 14, 2013). *Berger v. Comm'r of Soc. Sec.*, No. 12-11779, 2013 U.S. Dist. LEXIS 116399, at *24 (E.D. Mich. July 23, 2013) *adopted by* 2013 U.S. Dist. LEXIS 1415894, 2013 WL 4437254 (E.D. Mich. Aug. 16, 2013). Once the claim reaches the administrative hearing level, "the single decision-maker's assessment is no longer relevant to the determination of disability." *Malcolm*, 2015 U.S. Dist. LEXIS 39115 at *11; 2015 WL 1439711 at *5.

However, in this case, the RFC at the initial determination level was formulated by a consulting physician, Dinesh Tanna, M.D. [R. 10-3, Tr. 109]. The ALJ clearly relied on this opinion in her decision, specifically stating that "[t]he State agency medical consultant opined on the ability to perform light work with limited bilateral overhead reaching . . . I afforded the most weight to the opinions of the State agency consultants, as they were able to see much of the objective evidence of record . . . ." [R. 10-2, Tr. 35]. There is no evidence that the ALJ relied on a non-medical agency employee's opinion in making her determination.

**B. Weight Given to Medical Opinions of Record Regarding Mental Limitations**

Kennedy further takes issue with the ALJ's weighing of the medical opinions of record regarding her mental impairments. She argues that the

ALJ should have given more weight to the opinions of the three examining consultants than to the non-examining consultant psychologist who merely reviewed her records. While the regulations state that more weight will generally be given "to the opinion of a source who has examined you that to the opinion of a source who has not," there is no bright-line rule. 20 C.F.R. § 404.1527(d)(1); *Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454, 464 (6th Cir. 2012). Indeed, there are times when non-examining physicians' opinions are properly given the most weight, depending on the "degree to which they provide supporting explanations for their opinions," and the consistency between the opinions and the medical evidence of record. *Dragon*, 470 Fed. Appx. at 464 *citing* 20 C.F.R. § 404.1527(d)(3)-(4).

Here, the ALJ sufficiently explained her reasons for affording more weight to the non-examining consulting psychologist than to the other consultants of record. She noted that she afforded little weight to Dr. Steyaert's opinion because it was "partially based on [Kennedy's] self-reported physical symptoms, which is not his area of expertise, nor did he perform a physical examination." [R. 10-2, Tr. 35]. The ALJ's description of the questionable bases of Dr. Steyaert's opinion is accurate. [R. 10-7, Tr. 336].

The ALJ similarly gave little weight to Dr. Branscomb's issuance of mental limitations because it was "outside the scope of his examination" and "based on the claimant's complaints, with him not witnessing any of these memory problems." [R. 10-2, Tr. 35]. Dr. Branscomb's own notes reflect this. [R. 10-7, Tr. 640-42]. Finally, the ALJ assigned little weight to Dr. Bishop's opinion because the limitations imposed were "clearly based on physical problems for which she did not evaluate the claimant" and because "her diagnosis of dementia is not supported by memory testing or the claimant's numerous activities of daily living." [R. 10-2, Tr. 35]. Consistent with the ALJ's description, Dr. Bishop relied in part on Kennedy's "multiple medical problems" and alleged dementia when rendering her opinion. [R. 10-8, Tr. 351].

The ALJ afforded the most weight to the state agency psychological consultant, Dr. Starrett, because he was able to review the objective evidence, because his opinion was consistent with Kennedy's conservative treatment of record, and because his opinion was consistent with the objective findings of the consultative examinations. [R. 10-2, Tr. 35]. There is support in the record for the ALJ's analysis. Kennedy did not exhibit significant deficits in her memory or mental capacity during her consultative examinations. [R. 10-7, Tr. 335-36; R. 10-8, Tr. 650]. It is true

that Dr. Bishop found that Kennedy's testing reflected borderline intelligence, but she also noted Kennedy's arthritic hands may have affected the test results. [R. 10-8, Tr. 646-47].

Further, although she reported to the consulting examiners that she had memory problems and dementia since her aneurysm, she never reported such problems to her primary care physician, hematologist, or psychiatrist, and her outpatient psychiatric treatment records from 2010 indicated that her memory was "intact." [R. 10-7, Tr. 340-41, 345, 349-51, 404, 422, 435-37, 443, 530-32, 574-81, 601-602, 608]. Moreover, medical evidence does not corroborate the consulting psychologists' conclusions that Kennedy's medical issues are debilitating. As noted, Kennedy did not even appeal the ALJ's finding that her medical conditions are not disabling.

The ALJ was also correct in noting that Kennedy did not receive mental health counseling or psychiatric care until May 2010, and that she stopped working in 2008 because she planned to move to Asia rather than because of any impairment. [R. 10-2, Tr. 31, 34; R. 10-7, Tr. 340]. The record supports the ALJ's finding that Kennedy had only sporadic mental health treatment during the disability period, and that her condition improved during the one brief period of consistent treatment. [R. 10-2, Tr. 34; R. 10-7, Tr. 351-52, 530-32, 574-81, 601-602, 608]. The ALJ was also

accurate when she pointed out that Kennedy's testimony that her primary care doctor was still adjusting her Prozac and Xanax dosages was not supported by evidence in the record. [R. 10-2, Tr. 34]. There are no records showing that primary care physician Dr. Bachmeyer or any other physician prescribed medications for her mental health from March 2011 through the date of her hearing before the ALJ. [R. 10-7, Tr. 601-02].

For these reasons, the Court finds that substantial evidence supports the ALJ's decision to give little weight to the consulting psychological examiners, and to give greater weight to the reviewing state agency psychologist.

## IV. CONCLUSION

The Court finds that the ALJ's decision is legally sound and supported by substantial evidence of record, and therefore **RECOMMENDS** that Kennedy's Motion for Summary Judgment **[13]** be **DENIED**, the Commissioner's Motion **[16]** be **GRANTED** and this case be **AFFIRMED**.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: May 14, 2015

**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as “Objection #1,” “Objection #2,” etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as “Response to Objection #1,” “Response to Objection #2,” etc. The response must be **concise and proportionate in**

**length and complexity to the objections**, but there is otherwise no page limitation. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 14, 2015.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager